UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------X
LOVELY ANTOINE,

                 *Plaintiff*,

   -against-

BROOKLYN MAIDS 26, INC., and
JAMES HENESTROZA,

                *Defendants*.
----------------------------------X

**MEMORANDUM AND ORDER**

19-CV-5676 (KAM)

**KIYO A. MATSUMOTO, United States District Judge:**

       Plaintiff Lovely Antoine ("plaintiff") commenced this
action on October 8, 2019 against Brooklyn Maids 26, Inc.
("Brooklyn Maids") and James Henestroza (collectively,
"defendants"), asserting claims of discrimination, sexual
harassment, hostile work environment,[1] and retaliation on the
basis of her sex/gender under Title VII of the Civil Rights Act
of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the New York
State Human Rights Law ("NYSHRL"), N.Y. State Exec. Law §§ 296
*et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.
City Admin. Code §§ 8-107 *et seq.* (*See generally* ECF No. 1,
Compl.) Plaintiff further asserts claims of common law assault
and battery against Mr. Henestroza in his individual capacity.

---

[1] Plaintiff's claims of sexual harassment and hostile work environment
fall under her Title VII, NYSHRL, and NYCHRL sex/gender discrimination
claims.

(*Id.*) Plaintiff seeks to recover back pay, prejudgment interest on back pay, front wages, emotional distress damages, punitive damages, and post-judgment interest, as well as attorneys' fees and costs. (*Id.*) Presently before the court is plaintiff's motion for default judgment against defendants pursuant to Federal Rule of Civil Procedure 55(b) and Local Civil Rule 55.2(b). (*See generally* ECF No. 15, ECF No. 17.)

The court has reviewed plaintiff's unopposed submissions, which include the complaint, plaintiff's affidavit, the memorandum of law in support of plaintiff's motion for default judgment, the affidavits from plaintiff's counsel in support of plaintiff's motion for default judgment, plaintiff's supplemental submissions regarding damages, and the transcript of plaintiff's testimony at the June 26, 2020 damages inquest. For the reasons below, the court grants plaintiff's motion for default judgment with respect to all claims, awards compensatory and punitive damages with pre- and post-judgment interest, and attorneys' fees and costs.

## **BACKGROUND**

### I. **Factual Background**

The facts recited herein are drawn solely from plaintiff's complaint. Given defendants' failure to respond to the complaint, plaintiff's well-pleaded factual allegations are accepted as true. *See* Fed. R. Civ. P. 8(b)(6); *Greyhound*

2

*Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992) ("[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability.").  In determining whether a plaintiff is entitled to default judgment, the court is "limited to the non-conclusory, factual allegations" in the complaint.  *Johannes Baumgartner Wirtschafts-Und Vermogensberatung GmbH v. Salzman*, 969 F. Supp. 2d 278, 287 (E.D.N.Y. 2013).

Lovely Antoine accepted a job as a housekeeper for Brooklyn Maids in October 2018.  (Compl. ¶¶ 6, 14.)  At all relevant times, Mr. Henestroza was the Chief Executive Officer of Brooklyn Maids, and supervised plaintiff during her term of employment.  (*Id.* ¶¶ 10-11.)  In late January 2019, Henestroza asked plaintiff to clean his apartment.  (*Id.* ¶ 18.)  Plaintiff was subjected to inappropriate sexual remarks and advances at Henestroza's apartment.  (*Id.* ¶ 19.)  Henestroza brought plaintiff to his bedroom and told her, "this is where the magic happens."  (*Id.* ¶ 20.)  He also asked her about her sexual history and what kinds of sex acts she enjoyed.  (*Id.*)  After plaintiff left, Henestroza sent plaintiff text messages conveying his romantic interest in her, and describing the size of his penis.  (*Id.* ¶ 21.)  Plaintiff was "shocked" by Henestroza's behavior, rebuffed his overtures, and insisted that she was not romantically interested in him.  (*Id.* ¶ 22.)

Henestroza responded that he "really wanted to help her" and would provide her with more work hours and return her to a five-day per week schedule.[2]  (*Id.* ¶ 23.)

In early February 2019, Henestroza joined plaintiff on an apartment-cleaning assignment, ostensibly to help her with the laundry.  (Compl. ¶ 24.)  As plaintiff was working, Henestroza locked the apartment door and began pressuring her to have sex.  (*Id.* ¶ 25)  He then pushed her onto the bed and coerced her into having sex.  (*Id.*)  Afterward, plaintiff reiterated to Henestroza that she was not interested in him sexually and wanted to maintain a professional relationship. (*Id.* ¶ 26.)  Henestroza subsequently reduced plaintiff's workdays and work hours.  (*Id.* ¶ 27.)

In mid-February, plaintiff asked Henestroza when her normal hours would be restored.  (Compl. ¶ 28.)  In response, Henestroza withheld plaintiff's pay for time she had worked until late February, though he ultimately paid her back wages due.  (*Id.* ¶¶ 28-29.)  Soon after, Henestroza again withheld plaintiff's wages, prompting plaintiff to venture to Henestroza's house on March 1, 2019 in an attempt to collect her wages.  (*Id.* ¶ 30.)  Henestroza responded by throwing plaintiff against the wall and choking her. (*Id.* ¶ 31.)  Henestroza warned

---

[2]    Plaintiff's schedule was reduced to three days per week in mid-January because work at the McCarren Hotel (where plaintiff performed most of her cleaning assignments) had been slow.  (*Id.* ¶ 17.)

plaintiff not to come back to his home, and threatened that he
"used to kill animals as a child." (*Id.*)  Plaintiff told
Henestroza not to contact her again.  (*Id.* ¶ 32.)

Plaintiff concludes that the foregoing "are just some
of the ways Defendants discriminated and retaliated against
Plaintiff while employing her."  (*Id.* ¶ 37.)

## II.  Procedural Background

Plaintiff timely and properly filed her Title VII
charges with the Equal Employment Opportunity Commission
("EEOC") on July 1, 2019, and was granted the right to sue on
September 9, 2019.  (ECF No. 1-1.)  Plaintiff filed a federal
complaint against Brooklyn Maids and Mr. Henestroza on October
8, 2019, asserting sex/gender discrimination and retaliation
under Title VII, the NYSHRL, and the NYCHRL against both
parties, and assault and battery against Henestroza in his
individual capacity.  (*See generally* Compl.)

On October 30, 2019, Magistrate Judge Kuo scheduled an
Initial Conference for December 12, 2019.  (ECF No. 6.)  On
December 10, 2019, plaintiff moved to adjourn the upcoming
conference, having served Brooklyn Maids on October 22, 2019,
and Henestroza on November 16, 2019, without response or answer
from either defendant.  (ECF No. 10.)  Plaintiff concurrently
sought leave to move for default judgment.  (*Id.*)  On December
10, 2019, Magistrate Judge Kuo granted plaintiff leave to move

for default judgment against defendants.  (Dkt. Order dated Dec. 10, 2019.)

On January 13, 2020, plaintiff requested a certificate of default.  (ECF No. 11.)  The Clerk of Court entered default against defendants on January 21, 2020.  (ECF No. 14.)  On January 24, 2020, plaintiff filed a motion for entry of default judgment, supplemented with plaintiff's affidavit and memorandum and the affidavits of counsel.  (ECF Nos. 15-17.)  Defendants were served (ECF No. 16-6), but did not oppose the motion.  In addition, plaintiff provided live video testimony at a damages inquest, held on June 26, 2020.  (*See* Minute Entry dated June 26, 2020; *see generally* ECF No. 30, Transcript of Damages Inquest Hearing, held June 26, 2020 ("Inquest Tr.").)  Defendants were notified in advance of the inquest hearing (ECF No. 18), but did not appear.

### DISCUSSION

Federal Rule of Civil Procedure 55 establishes a two-step process in the event of a defendant's default.  First, the Clerk of the Court must enter the default if defendant fails to "plead or otherwise defend" in response to a properly served and filed complaint.  Fed. R. Civ. P. 55(a); *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011).  Second, a default judgment may then be entered if the complaint sets forth a valid claim and the plaintiff has established her entitlement

to a specific amount of damages.  Fed. R. Civ. P. 55(b).  When determining whether to grant a default judgment, the court considers three factors: "(1) whether the defendant's default was willful; (2) whether defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment." *Joseph v. HDMJ Restaurant, Inc.*, 970 F. Supp. 2d 131, 141 (E.D.N.Y. 2013) (quoting *Mason Tenders Dist. Council v. Duce Constr. Corp.*, No. 02-CV-9044, 2003 WL 1960584, at *2 (S.D.N.Y. Apr. 25, 2003)).[3]  The below analysis considers these factors with respect to plaintiff's motion for entry of default judgment against defendants.

## I.   Willfulness

The Second Circuit has held that failure to respond to a complaint evinces willful default. *See S.E.C. v. McNulty*, 137 F.3d 732, 738–39 (2d Cir. 1998) (unexplained failure to respond to complaint indicates willfulness); *Indymac Bank v. Nat'l Settlement Agency, Inc.*, No. 07-CV-6865, 2007 WL 4468652, at *1 (S.D.N.Y. Dec. 20, 2007) (finding defendants' failure to appear, failure to respond to the complaint, and failure to respond to a

---

[3]    Although courts generally apply these factors to determine whether to *relieve* a party from default or default judgment, *see Pecarsky v. Galaxiworld.com LTD*, 249 F.3d 167, 171 (2d Cir. 2001); *Davis v. Musler*, 713 F.2d 907, 915 (2d Cir. 1983), district courts in this circuit have similarly employed this analysis in determining whether to grant a default judgment. *See Joseph*, 970 F. Supp. 2d at 141; *Mason Tenders*, 2003 WL 1960584, at *2; *Santana v. Latino Express Rest., Inc.*, 198 F. Supp. 3d 285, 291 (S.D.N.Y. 2016).

motion for default judgment indicated willful conduct); *United States v. DiPaolo*, 466 F. Supp. 2d 476, 482 (S.D.N.Y. 2006) (grounds for default judgment were established by defendant's failure to answer the complaint, particularly in light of the fact that the defendant had expressed no intention to do so at a later time).

It is indisputable that defendants have not appeared, or responded to the complaint or plaintiff's default motion.  As an initial matter, however, the court must determine whether service was properly effected upon defendants in order to determine whether their default was willful.  *See Deep Foods Inc. v. Deep Foods Inc.*, 419 F. Supp. 3d 569, 577 (W.D.N.Y. 2019) (willfulness found where plaintiff submitted proof of service demonstrating the summons and complaint were personally served on defendants, plaintiff's motion for default judgment was served upon defendants at their last known addresses, and defendants also did not respond to either).

A defendant may be served as provided by Rule 4 of the Federal Rules of Civil Procedure.  Under Rule 4(e)(1), an individual may be served in a judicial district of the United States by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made[.]" Fed. R. Civ. P. 4(e)(1).  Accordingly, service here was proper

if it conformed to the requirements of the New York Civil
Practice Law and Rules ("CPLR").  Plaintiff properly served
defendant Brooklyn Maids under CPLR § 311(a)(1)[4] and New York
Business Corporation Law § 306(b)(1):[5] on October 22, 2019, a
process server over the age of 18 presented Sue Zouky, a legal
clerk for the Secretary of State, with a copy of the summons and
complaint.  (ECF No. 5.)  Plaintiff likewise properly served Mr.
Henestroza under CPLR § 308(2):[6] on November 16, 2019, a process
server over the age of 18 served a copy of the summons and
complaint to a co-tenant at plaintiff's last known residence;

---

[4]     The pertinent text of CPLR § 311(a)(1) provides that:

Personal service upon a corporation . . . shall be made by delivering
the summons . . . upon any domestic or foreign corporation, to an
officer, director, managing or general agent, or cashier or assistant
cashier or to any other agent authorized by appointment or by law to
receive service.  A business corporation may also be served pursuant to
section three hundred six or three hundred seven of the business
corporation law.

[5]     New York Business Corporation Law § 306(b)(1) provides that:

Service of process on the secretary of state as agent of a domestic or
authorized foreign corporation shall be made by personally delivering
to and leaving with the secretary of state or a deputy, or with any
person authorized by the secretary of state to receive such service, at
the office of the department of state in the city of Albany, duplicate
copies of such process together with the statutory fee, which fee shall
be a taxable disbursement.  Service of process on such corporation
shall be complete when the secretary of state is so served.

[6]     The pertinent text of CPLR § 308(2) provides that personal service
shall be made:

[B]y delivering the summons within the state to a person of suitable
age and discretion at the . . . dwelling place or usual place of abode
of the person to be served and by either mailing the summons to the
person to be served at his or her last known residence . . . in an
envelope bearing the legend "personal and confidential" and not
indicating on the outside thereof, by return address or otherwise, that
the communication is from an attorney or concerns an action against the
person to be served, such delivery and mailing to be effected within
twenty days of each other . . . .

then, on November 19, 2019, the process server mailed a copy of
the summons and complaint, via first class mail and in an
envelope marked "PERSONAL & CONFIDENTIAL," which did not
indicate that the communication was from an attorney or
concerned an action against Mr. Henestroza, to Henestroza's last
known residence.  (ECF No. 8.)  There is no indication that this
mailing was not delivered to Henestroza.

Although properly served, defendants never answered
the complaint, nor did they request an extension of time to
respond.  On January 24, 2020, plaintiff also mailed to
defendants a copy her memorandum of law and related exhibits in
support of her default motion, to which defendants again did not
respond.  In addition, on August 13, 2020, plaintiff's counsel
informed the court that he had received a phone call from Mr.
Henestroza.  (ECF No. 28, Status Letter dated Aug. 13, 2020.)
According to counsel, Mr. Henestroza conveyed that he was aware
of the suit, and represented that he had an attorney, but
refused to provide his representative's name or contact
information, and insisted that plaintiff's counsel submit all
correspondence "through the Secretary of State."  (*Id.*)  It thus
appears Henestroza is fully aware of the instant action.
Accordingly, defendants' complete failure to respond
sufficiently demonstrates willful default.  *See Santana*, 198 F.
Supp. 3d at 191 ("Defendant's non-appearance and failure to

respond to Plaintiff's Complaint or Motion to For [*sic*] Default Judgment indicates willful conduct."); *United States of America v. Myers*, 236 F. Supp. 3d 702, 707 (E.D.N.Y. 2017) ("Defendant's failure to answer the Amended Complaint and to respond to the [motion for default] demonstrated willfulness under existing case law.").

## II.  Meritorious Defenses

A defense is meritorious "if it is good at law so as to give the factfinder some determination to make." *Am. Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996).  However, "[w]here a defendant fails to answer the complaint, courts are unable to make a determination whether the defendant has a meritorious defense to the plaintiff's allegations, and, accordingly, this factor weighs in favor of granting a default judgment." *Joseph*, 970 F. Supp. 2d at 143 (citing *Empire State Carpenters Welfare v. Darken Architectural Wood*, No. 11-CV-46, 2012 WL 194075, at *3 (E.D.N.Y Jan. 17, 2012) and *Mack Fin. Serv. v. Poczatek*, No. 10-CV-3799, 2011 WL 4628695, at *4 (E.D.N.Y. Aug. 30, 2011)).  Moreover, when a defendant has not presented a defense to the court, the well-pleaded allegations in plaintiff's complaint are presumed to be true.  *Indymac Bank*, 2007 WL 4468652, at *1; *Myers*, 236 F. Supp. 3d at 707-08.

Defendants have asserted no meritorious defenses to plaintiff's well-pleaded factual allegations.  Notwithstanding, a plaintiff still must demonstrate that the factual allegations set forth in her complaint state valid claims to relief.  *Myers*, 236 F. Supp. 3d at 708; *see Said v. SBS Elecs., Inc.*, No. CV-08-3067, 2010 WL 1265186, at *2 (E.D.N.Y. Feb. 24, 2010) ("With respect to liability, a defendant's default does no more than concede the complaint's factual allegations; it remains the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action."); *J & J Sports Prods., Inc. v. Daley*, No. 06-CV-0238, 2007 WL 7135707, at *3-4 (E.D.N.Y. Feb. 15, 2007) ("conclusory allegations based on information and belief" are insufficient to support a finding of default-based liability).  The court now turns to the sufficiency of the allegations in the complaint and finds, for the following reasons, that the plaintiff's allegations are sufficient to establish liability, and the defendants lack meritorious defenses to the claims asserted.

**A. Sex Discrimination**

### 1. Title VII and the NYSHRL

Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with

respect to [her] compensation, terms, conditions, or privileges
of employment, because of such individual's . . . sex."  42
U.S.C. § 2000e-2(a)(1).  Similarly, the NYSHRL provides that
"[i]t shall be an unlawful discriminatory practice [f]or an
employer," on account of an individual's sex, "to discriminate
against such individual in compensation or in terms, conditions
or privileges of employment."  N.Y. Exec. Law. § 296(1)(a).
Moreover, "[h]ostile work environment and retaliation claims
under the NYSHRL are generally governed by the same standards as
federal claims under Title VII." *Schiano v. Quality Payroll
Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006); *see Setty v.
Fitness*, No. 17CV06504NGGSMG, 2018 WL 8415414, at *4 (E.D.N.Y.
Dec. 18, 2018), *report and recommendation adopted sub nom. Setty
v. Synergy Fitness*, No. 17CV6504NGGSMG, 2019 WL 1292431
(E.D.N.Y. Mar. 21, 2019); *Petrisch v. HSBC Bank USA, Inc.*, 2013
WL 1316712, at *12 (E.D.N.Y. Mar. 28,2014).  Thus, the court
will consider plaintiff's Title VII and NYSHRL claims in tandem.
*See Smith v. Xerox Corp.*, 196 F. 3d 358, 372 n.1 (2d Cir. 1999)
("[S]ince claims under the NYSHRL are analyzed identically to
claims under . . . Title VII, the outcome of an employment
discrimination claim made pursuant to the NYSHRL is the same as
it is under . . . Title VII.") (citation omitted).

Plaintiff alleges that Mr. Henestroza subjected her to
recurrent and severe sexual harassment, amounting to a hostile

13

work environment.  Courts have construed both Title VII and the NYSHRL to include claims of a "discriminatorily hostile or abusive environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Setty*, 2018 WL 8415414, at *5.  Although Title VII's anti-discrimination provision does not explicitly proscribe sexual harrassment arising out of a hostile work environment, the Supreme Court has recognized the existence of this cause of action.  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) ("[C]ourts have uniformly held, and we agree, that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."); *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 114 (2d Cir. 2018) ("Today, the Supreme Court and lower courts 'uniformly' recognize sexual harassment claims as a violation of Title VII, notwithstanding the fact that, as evidenced by the district court decision in *Barnes*, this was not necessarily obvious from the face of the statute.") (citation and appellate history omitted).

     A plaintiff raising a hostile work environment claim under either Title VII or the NYSHRL must show that "the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Terry v. Ashcroft*, 336 F.3d 128, 147-48 (2d Cir. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 373

(2d Cir. 2002)).  To determine whether a work environment is hostile, a court must look to the surrounding circumstances including:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris*, 510 U.S. at 23.  Generally, incidents of harassment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Joseph*, 970 F. Supp. 2d at 145 (internal quotation marks omitted).  However, even an isolated incident can meet the threshold for hostility if it can and does independently "work a transformation of the plaintiff's workplace."  *Alfano*, 294 F.3d 365, 374 (2d Cir. 2002).  Accordingly, a plaintiff alleging a hostile work environment "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were `sufficiently continuous and concerted' to have altered the conditions of her working environment."  *Id.* (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)).

Plaintiff's hostile work environment claim hinges primarily on two incidents.  Whether considered individually or collectively, however, the alleged conduct easily surpasses the threshold of severity.  First, in January 2019, Henestroza allegedly induced plaintiff to enter his bedroom on the pretense that she was on a cleaning assignment, and instead, propositioned her for sex and inquired about her sexual history. After plaintiff declined, Henestroza volunteered an unsolicited description of his penis and reiterated his romantic interest in her.  She rebuffed him, to which Henestroza responded with an offer of additional work hours "to help her."  Then, in February 2019, Henestroza joined plaintiff on a cleaning assignment, presumably to help her with the laundry, but, in fact, as a pretext to contrive a sexual encounter.  Plaintiff alleges Henestroza sexually assaulted her.  He locked the door, groped her, pushed her onto the bed, and coerced Ms. Antoine into having sex with him.  Plaintiff thereafter reiterated that she was not sexually interested in Henestroza, but this time, instead of offering to "help her," he withheld her wages.

The Second Circuit has recognized that, "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability."  *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995), *abrogated on*

16

*other grounds by Burlington Indus, Inc. v. Ellerth*, 524 U.S. 742
(1998).  Here, Henestroza's sexual assault of plaintiff in
February 2019 was independently severe enough to create a
hostile and abusive work environment, and constitutes *per se*
liability under Title VII and the NYSHRL.  *See Redd v. New York
Div. of Parole*, 678 F.3d 166, 179 (2d Cir. 2012) ("Direct
contact with an intimate body part constitutes one of the most
severe forms of sexual harassment."); *see also Garcia v. N.Y.
City Health & Hosps. Corp.*, No. 15-CV-2119 (DAB), 2016 WL
4097850, at *6 (S.D.N.Y. July 26, 2016) (allegations of grabbing
plaintiff's buttocks, "nibbling" his ear, and kissing him on the
lips amounted to "physical harassment that could reasonably be
perceived as intimidating and humiliating").  Moreover,
plaintiff's repeated attempts to forestall Henestroza's advances
warrant the reasonable inference that she found his conduct
subjectively hostile and abusive.  Accordingly, plaintiff was
subjected to a hostile work environment under Title VII and the
NYSHRL.

     2. <u>NYCHRL</u>

     "'The New York City Human Rights Law was intended to
be more protective than [its] state and federal counterpart.'"
*Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 579 (S.D.N.Y.
2011) (quoting *Farrugia v. N. Shore Univ. Hosp.*, 820 N.Y.S.2d
718, 724 (N.Y. Sup. Ct. 2006)).  To state a claim for gender

discrimination under the NYCHRL, a "plaintiff need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (quoting *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 78 (N.Y. App. Div. 1st Dep't 2009)).  Further, the NYCHRL does not distinguish between discrimination and hostile work environment claims; rather, both are governed by N.Y.C. Admin. Code § 8-107(1)(a); *Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) ("Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims.") (citation omitted).  "Employers may only avoid liability under the NYCHRL for conduct that results in an employee being treated less well because of her gender, when the conduct complained of constitutes nothing more than petty slights and trivial inconveniences." *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 260 (S.D.N.Y. 2014) (citations and internal quotation marks omitted).  Because plaintiff has adequately pled a claim for hostile work environment under the NYSHRL, she has also done so under the NYCHRL. *See Winston v. Verizon Servs. Corp.*, 633 F. Supp. 2d 42, 48 (S.D.N.Y. 2009) (allegations that successfully state a claim under the NYSHRL "[a] fortiori . . . state[s] a claim under the [NYCHRL] . . . ,

which is more liberal than either its state or federal counterpart.") (citations omitted).

**B. Retaliation**

    1. <u>Title VII and NYSHRL</u>

    "'The standards for evaluating retaliation claims are identical under Title VII and the NYSHRL.'" *Setty*, 2018 WL 8415414, at *9 (quoting *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 454 (E.D.N.Y. 2013)).  Title VII provides that it is unlawful for an employer "to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter . . . ."  42 U.S.C. § 2000e-3(a).  Similarly, the NYSHRL makes it an unlawful discriminatory practice for an employer "to expel or otherwise discriminate against any person because [she] has opposed any practices forbidden under this article . . . ."  N.Y. Exec. Law § 296(1)(3).  "To make out a prima facie case of retaliation, a plaintiff must make four showings: that '(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity.'"  *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (quoting *Schiano*, 445 F.3d at 608).  The court addresses each requirement in turn below.

First, plaintiff engaged in a "protected activity" by objecting to Henestroza's sexual advances.  A "protected activity" is an activity "taken to protest or oppose statutorily prohibited discrimination."  *Wimes v. Health*, 157 F. App'x 327, 328 (2d Cir. 2005) (quoting *Cruz*, 202 F.3d at 566, *superseded on other grounds by* N.Y.C. Local L. No. 85).  A plaintiff need not file a formal complaint to engage in a protected activity; paradigmatic examples of protected activities include "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of coworkers who have filed formal charges."  *Cruz*, 202 F.3d at 566 (citation omitted).

District courts in the Second Circuit diverge somewhat as to whether rejecting a harasser's sexual advances constitutes a protected activity.  *Compare Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 448 (S.D.N.Y. 2018) ("[Defendant's] sexual advances 'qualified as an unlawful employment practice,' and [plaintiff] engaged in protected activity each time she rejected them."), *with Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 189 (E.D.N.Y. 2012) ("rejection of sexual advances does not constitute a protected activity"); *compare Burrell v. CUNY*, 894 F. Supp. 750, 761 (S.D.N.Y. 1995) (refusing to accede to sexual advances is an activity protected under Title VII), *with Del Castillo v. Pathmark Stores, Inc.*,

941 F. Supp. 437, 438-39 (S.D.N.Y. 1996) (plaintiff did not state retaliation claim where her immediate supervisor allegedly assigned her undesirable work after she rebuffed his sexual advances).  Courts have justified excluding rejection of sexual advances from the scope of protected activities by warning that "every harassment claim would automatically state a retaliation claim" were resisting a harasser's advances to constitute a "protected activity." *Reid*, 876 F. Supp. 2d at 189 (quoting *Del Castillo*, 941 F. Supp. at 439).

The court disagrees with that position, however, and adopts the stance aptly expressed by Judge Pauley, that conceiving "protected activity" so narrowly "overlook[s] the complex dynamics underlying a work environment fraught with power disparities." *Hughes*, 304 F. Supp. 3d at 448.  As Judge Pauley explained:

> Sexual harassment can manifest itself in many forms. Some are less obvious than others but just as invidious. Formally reporting an incident of sexual assault is one form of protected activity, but it is not always available. An individual who is sexually harassed by her supervisor, or someone with clout within the company, faces a Hobson's choice—she is either forced to endure her supervisor's unwanted overtures, or file a complaint that will inevitably bruise his ego and jeopardize her job and career.

*Id.*  A majority of courts confronted with this issue have reached a similar conclusion. *See, e.g., Johnson v. Medisys Health Network*, 2011 WL 5222917, at *16 (E.D.N.Y. June 1, 2011)

("There is no reason to disagree with the view of the majority of courts that allegations that an employee consistently refused her supervisor's sexual advances constitutes 'protected activity' for purposes of a retaliation claim."); *Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp. 2d 330, 386 (S.D.N.Y. 2002) ("Rejecting sexual advances from an employer [ ] constitutes 'protected activity.' The prohibition against retaliation is intended to protect employees who resist unlawful workplace discrimination. Sexual harassment by an employer or supervisor is an unlawful practice, and an employee's refusal is a means of opposing such unlawful conduct.").

This case features the sort of workplace power imbalance that *Hughes* contemplated.  Plaintiff's harasser, Henestroza, was also the company CEO.  Henestroza made his unwelcome advances in private settings, outside of public view. It is reasonable to infer plaintiff harbored a fear that formally resisting Henestroza's advances would have devolved into a "he said, she said" dispute with her employer's most senior officer, with little prospect of anyone taking her side, and a severe risk of repercussions.  Thus, plaintiff rejected Henestroza's alleged sexual advances by, *inter alia*, expressing to him personally that she was not romantically interested in him.  Plaintiff's verbal and physical expressions of resistance

to Henestroza's sexual advances were protected activities under Title VII and the NYSHRL.

The remaining elements of plaintiff's retaliation claim are plainly established by her allegations.  The complaint alleges that plaintiff rejected Henestroza's sexual advances by telling him directly, thus making clear to Henestroza that plaintiff was engaging in a protected activity.  Thereafter, Henestroza reduced plaintiff's hours, and withheld her wages.  These actions constitute "materially adverse actions" because "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *see also Radice v. Eastport S. Manor Cent. Sch. Dist.*, No. CV 17-1 (GRB)(ST), 2020 WL 1041124, at *12 (E.D.N.Y. Feb. 5, 2020) ("[T]he reduction of hours from 180 to 80 hours of work time constitutes an adverse employment action."); *Lin v. Great Rose Fashion, Inc.*, No. 08-CV-4778(NGG)(RLM), 2009 WL 1544749, at *17 (E.D.N.Y. June 3, 2009) (reduction of hours constituted adverse action).

Finally, the timing of Henestroza's adverse actions suggest they were in response to plaintiff's protected activity.

In early February 2019, following an encounter in which
Henestroza allegedly coerced plaintiff into sexual intercourse,
plaintiff informed Henestroza that she was not interested in a
sexual relationship with him.  (Compl. ¶¶ 25-26.)  By mid-
February, Henestroza had docked plaintiff's workdays and hours,
then began withholding her pay altogether.  (*Id.* ¶¶ 27-28.)
Causation can be pled "*indirectly* by showing that the protected
activity was followed closely by discriminatory treatment . . .
."  *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991) (internal
quotations and citations omitted, emphasis in original).  Here,
the "close temporal proximity" between plaintiff's expressions
of disinterest in a sexual relationship, and Henestroza's
adverse actions, is more than sufficient to infer causation in
establishing a prima facie case of retaliation.  *See Summa*, 708
F.3d 115 at 128.

       2. <u>NYCHRL</u>

       A plaintiff can assert a retaliation claim under the
NYCHRL by alleging that "the employer engaged in conduct that
was reasonably likely to deter a person from engaging in"
protected activity, including, objecting to sexually harassing
behavior.  *See Mihalik*, 715 F.3d at 112 (internal citation
omitted).  As with Title VII and NYSHRL, "the NYCHRL require[s]
a causal connection between an adverse act and a protected
activity to prove a retaliation claim."  *See, e.g.*, *Dudley v.*

*N.Y.C. Hous. Auth.*, No. 12 Civ. 2771, 2014 WL 5003799, at \*25 (S.D.N.Y. Sept. 30, 2014).  Unlike its federal and state law counterparts, however, "a plaintiff is not required to show, 'a material adverse action' under the NYCHRL." *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 394 (S.D.N.Y. 2019). In short, because plaintiff's allegations of retaliation meet the higher pleading thresholds under Title VII and NYSHRL, the plaintiff's claim also meets the requirements of the NYCHRL. *See Hagan v. City of N.Y.*, 39 F. Supp. 3d 481, 503 (S.D.N.Y. 2014) ("[T]he city law grants employees broader protections than its federal and state counterparts.").

### C. Individual and Employer Liability

#### 1. Title VII

Although Henestroza perpetrated the alleged harassment and retaliation at issue, Title VII does not provide for individual liability.  *Tomka*, 66 F.3d at 1313-14.  An employer, on the other hand, can be held vicariously liable under Title VII for the unlawful conduct of supervisors with the capacity to take "tangible employment actions." *Setty*, 2018 WL 8415414, at \*7 (citing *Dillon v. Ned Mgmt., Inc.*, F. Supp. 3d 639, 655 (E.D.N.Y. 2015)).  Liability may be imputed to an employer where its supervisors engage in either discriminatory harassment or retaliatory conduct.  *See, e.g.*, *Bethea v. City of N.Y.*, No. 11 CV 2347 (SJ) (MJA), 2014 WL 2616897, at \*7 (E.D.N.Y. June 12,

2014) ("[H]arassment and the retaliation at the hands of a
supervisor empowered to take tangible employment actions will
trigger an employer's vicarious liability, but an employer is
also liable where it has negligently allowed harassment or
retaliation to occur or persist."); *Muraj v. UPS Freight Servs.*,
No. 04-CV-6563 CJS, 2006 WL 2528538, at *3 (W.D.N.Y. Aug. 31,
2006) (concluding that "under general principles of vicarious
liability under Title VII, an employer may be held vicariously
liable for tangible employment actions taken by its
supervisors," which includes retaliation); *see also Mys v.
Michigan Dep't of State Police*, 886 F.3d 591, 600 (6th Cir.
2018) ("An employer is also vicariously liable for retaliation
that a supervisor initiates against an employee by causing
another actor, that might itself lack retaliatory animus, to
take an adverse action against the employee.").

　　　　Henestroza's sexual harassment of, and retaliation
against plaintiff, are imputed to Brooklyn Maids because
Henestroza was plaintiff's direct supervisor.  Henestroza was
the company CEO, maintained control over plaintiff's
compensation and hours, and, on several occasions, told
plaintiff where to work.  Therefore, Henestroza had authority to
take "tangible employment actions" in his capacity as Brooklyn
Maids' CEO.  "When, as here, the alleged harasser is in a
supervisory position over the plaintiff, the objectionable

conduct is automatically imputed to the employer." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010) (citations omitted); *Welch v. Bill Cram, Inc.*, No. 6:15-CV-06391(MAT), 2017 WL 3676040, at *4 (W.D.N.Y. Aug. 25, 2017). Accordingly, Brooklyn Maids is liable under Title VII for Henestroza's misconduct.

### 2. NYSHRL

Under the NYSHRL, "[a]n employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it.'" *Romero v. City of N.Y.*, 839 F. Supp. 2d 588, 635 (E.D.N.Y. 2012) (quoting *Doe v. State*, 89 A.D.3d 787, 788 (N.Y. App. Div. 2d Dep't 2011)). "Condonation, which may sufficiently implicate an employer in the discriminatory acts of its employee to constitute a basis for employer liability under the Human Rights Law, contemplates a knowing, after-the-fact forgiveness or acceptance of an offense." *State Div. of Human Rights ex rel. Greene v. St. Elizabeth's Hosp.*, 487 N.E.2d 268, 269 (N.Y. 1985); *see Selmanovic v. NYSE Grp., Inc.*, No. 06-CV-3046, 2007 WL 4563431, at *4 (S.D.N.Y. Dec. 21, 2007). Alternatively, an employer's "calculated inaction in response to discriminatory conduct, may as readily as affirmative conduct, indicate condonation." *Guzman v. Macy's Retail Holdings, Inc.*, No. 09-CV-4472, 2010 WL 1222044, at *11 (S.D.N.Y. Mar. 29, 2010)

(quoting *Melendez v. Int'l Serv. Sys., Inc.*, No. 97-CV-8051, 1999 WL 187071, at *15 (S.D.N.Y. Apr. 6, 1999)).

Plaintiff alleges that "[d]efendants had knowledge of and/or acquiesced in the discrimination and/or harrassment by [] Henestroza." (Compl. ¶ 38.)  The court need not credit this conclusory allegation, however.  *JXB 84 LLC v. Khalil*, No. 15CV6251NGGJO, 2017 WL 1184001, at *2 (E.D.N.Y. Feb. 17, 2017), *report and recommendation adopted*, No. 15CV6251NGGJO, 2017 WL 1184141 (E.D.N.Y. Mar. 29, 2017) ("The fact that a complaint stands unanswered does not, however, suffice to establish liability on its claims: a default does not establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading.").  The complaint is bereft of allegations that any actor, other than Henestroza, was remotely aware of, or blinded themselves to, his conduct.  Indeed, Henestroza's aggressions against plaintiff occurred in private settings, outside the presence of others, and plaintiff does not allege that she informed personnel at Brooklyn Maids, or that Brooklyn Maids otherwise came to learn, of her mistreatment.  Similarly absent are allegations that Brooklyn Maids or its personnel, other than Henestroza himself, were aware of his retaliatory acts against plaintiff.  Nor does the complaint allege, or plaintiff's memorandum of law assert, that Brooklyn Maids is Henestroza's alter ego.  Plaintiff thus fails to sufficiently allege any

basis to hold Brooklyn Maids liable under the NYSHRL for Henestroza's conduct.

In contrast to Title VII, however, individuals may be held liable under the NYSHRL for employment discrimination. *See Mandell v. Cty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003). An individual may be held liable under the NYSHRL where, *inter alia*, he has an ownership interest in the business or is a supervisor that can make hiring and firing decisions. *EEOC v. Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 523 (E.D.N.Y. 2014) (quoting *Tomka*, 66 F.3d at 1317, and N.Y. Exec. Law § 296). Although the complaint does not allege that Henestroza owned Brooklyn Maids, in whole or in part, during the relevant time period, Henestroza, as CEO, clearly had authority to "do more than carry out personnel decisions made by others." *Id.* As discussed above, Henestroza held and exercised authority over plaintiff's work schedule, pay, and assignments. He is, therefore, subject to liability under § 296(1) of the NYSHRL. *See Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 53 (2d Cir. 2014) ("[A]s a general rule, individuals may be subject to liability as employers 'if they have ownership interests in the [employer] or do more than carry out personnel decisions of others.'") (alteration in original) (quoting *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012)).

3. <u>NYCHRL</u>

Both Henestroza and Brooklyn Maids are liable under
the NYCHRL.  Employers may be held liable under the NYCHRL
where, *inter alia*, "the offending employee exercised managerial
or supervisory responsibility . . . ." *Setty*, 2018 WL 8415414,
at *9 (quoting *Zakrzewska v. New Sch.*, 14 N.Y.3d 469, 479 (N.Y.
2010)).  Individuals may be held liable under Section 8-
107(1)(a) of the NYCHRL "if they actually participated in the
conduct giving rise to the discrimination claim." *Dillon*, 85 F.
Supp. 3d at 658.  Accepting the complaint's well-pleaded
allegations as true, the court finds plaintiff has established
both Brooklyn Maids' employer liability and Henestroza's
individual liability under the NYCHRL.  As the harasser and
retaliator, Henestroza is subject to liability under Section 8-
107(1)(a) for actually participating in the discriminatory
conduct.  Moreover, because Henestroza—the "offending employee"—
exercised managerial or supervisory responsibility, liability
may properly be imputed to Brooklyn Maids, the plaintiff's
employer. Accordingly, both defendants are properly held liable
for sex discrimination and retaliation under the NYCHRL.

## D. Assault and Battery

The complaint further asserts causes of action under
New York state law for assault and battery.  The complaint does
not pinpoint precisely which conduct the tort claims are
predicated upon, but it is reasonably clear that the assault and

battery allegations relate to: (1) the February 2019 incident in which Henestroza pushed plaintiff onto a bed and sexually assaulted her; and (2) Henestroza's physical attack against plaintiff at his home, in or around March 1, 2019, during which he choked her.  (Compl. ¶¶ 25, 30-31, 63-65.)

Without question, the complaint states a claim for assault and battery.  To state claims for assault and battery under New York law, a plaintiff must allege "an intentional placing of another person in fear of imminent harmful or offensive contact" and "an intentional wrongful physical contact with another person without consent," respectively.  *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001) (citation and internal quotation marks omitted).  In February 2019, while Henestroza and plaintiff were alone in a room, Henestroza locked the door, cutting plaintiff off from a means of exit.  At this point, given Henestroza's past advances, it is plausibly alleged that plaintiff reasonably perceived Henestroza was posing a physical menace to her body.  Subsequent events, as alleged, leave no room for interpretation.  Henestroza intentionally put plaintiff in fear of imminent offensive contact.  He pushed plaintiff onto a bed and coerced her into intercourse.[7]  The

---

[7]     These allegations of sexual intercourse by forcible compulsion, if proven, potentially constitute criminal rape under New York law.  *See* New York Penal Law § 130.35(1) ("A person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person . . . [b]y forcible compulsion.").  "In the civil context, the common meanings of

March 2019 incident is equally clear-cut.  Henestroza threw
plaintiff against a wall and choked her.  As if this violent
aggression were not enough, Henestroza warned plaintiff that he
"used to kill animals as a child," and that she too should be
afraid.  In both instances, the complaint sufficiently alleges
that Henestroza intentionally caused plaintiff to fear imminent,
harmful, and offensive contact, and did wrongfully contact her
without consent.  Henestroza is thus personally liable for
assault and battery.

## III. Prejudice Toward Plaintiff

Plaintiff has established claims against defendants
for sex/gender discrimination and retaliation under Title VII,
the NYSHRL, and the NYCHRL: Henestroza is liable for
discrimination and retaliation under the NYSHRL and NYCHRL, and
defendant Brooklyn Maids is liable for discrimination and
retaliation under Title VII and the NYCHRL.  Henestroza is also
liable for civil assault and battery.

The final factor the court must consider in
determining whether to grant plaintiff's motion for default
judgment is whether plaintiff would be prejudiced if her motion
for default were denied.  Denying the motion would be

---

'assault' and 'battery' subsume all forms of tortious menacing and unwanted
touching."  *See Girden*, 262 F.3d at 203 (quoting *United Nat'l Ins. Co. v.
Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993) and citing 6A
N.Y. Jur. 2d *Assault—Civil Aspects* § 2).  Rape indisputably encompasses civil
assault and battery under New York law.  *United Nat'l Ins. Co.*, 994 F.2d at
108.

prejudicial to plaintiff "as there are not additional steps available to secure relief in this [c]ourt." *Bridge Oil Ltd. v. Emerald Reefer Lines, LLC*, No. 06-CV-14226, 2008 WL 5560868, at *2 (S.D.N.Y. Oct. 27, 2008) (citing *Mason Tenders*, 2003 WL 1960584, at *3). Without the entry of a default judgment, plaintiff would be unable to recover for the claims adequately set forth in the complaint. A default judgment is thus warranted.

### DAMAGES

With defendants' liability established, the court now assesses the damages that plaintiff is entitled to recover. Allegations of liability are deemed admitted upon default; allegations of damages are not. *See Greyhound*, 973 F.2d at 158. Rather, a court must ensure that there is an adequate basis for the damages sought by a plaintiff before entering judgment in the amount demanded. *See Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989). The court must also be able to ascertain the amount of damages "with reasonable certainty." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997).

A court may make this determination based upon evidence presented at a hearing or upon a review of "detailed affidavits or documentary evidence." *Id.*; *see also* Fed. R. Civ. P. 55(b)(2); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504,

508 (2d Cir. 1991).  In addition, where the damages are "not
susceptible to simple mathematical calculation, Federal Rule of
Civil Procedure 55(b)(2) gives courts discretion to determine
whether an evidentiary hearing is necessary or whether to rely
on detailed affidavits or documentary evidence." *Am. Jewish
Comm. v. Berman*, No. 15 Civ. 5983 (LAK) (JLC), 2016 WL 3365313,
at *4 (S.D.N.Y. June 15, 2016) (internal citation omitted).

Plaintiff initially set forth her damages contentions
in an affidavit and memorandum of law.  (*See generally* ECF No.
16-1, Affidavit of Lovely Antoine ("Antoine Aff."); ECF No. 17,
Memorandum of Law in Support of Plaintiff's Motion for Default.)
On June 26, 2020, the court held an inquest to adduce further
evidence regarding plaintiff's damages claims.  Following the
inquest, plaintiff further advanced her damages contentions in a
supplemental memorandum of law and additional exhibits.  (*See*
ECF No. 25, Pl.'s Supplemental Brief on Damages and Attorneys'
Fees ("Pl.'s Supp. Br."); ECF No. 25-2, Plaintiff's Notes
Regarding Her Work Schedule ("Antoine Notes"); ECF No. 26,
Affidavit of Liana Kaplan, MSW ("Kaplan Aff.").)  Of course, the
court may only consider plaintiff's submissions and testimony to
the extent they are admissible.  *See Poulos v. City of N.Y.*, No.
14 Civ. 3023 (LTS) (BCM), 2018 WL 3750508, at *2 (S.D.N.Y. July
13, 2018), *report and recommendation adopted*, 2018 WL 3745661
(S.D.N.Y. Aug. 6, 2018); *see House v. Kent Worldwide Mach.*

*Works, Inc.*, 359 F. App'x 206, 207 (2d Cir. 2010) (summary order) ("[D]amages must be based on admissible evidence."). Here, the court finds Ms. Antoine's testimony, affidavit, and exhibits are indeed admissible to demonstrate her damages. *See Angulo v. 36th St. Hosp. LLC*, No. 19CIV5075GBDSLC, 2020 WL 4938188, at *10 (S.D.N.Y. July 31, 2020), *report and recommendation adopted*, No. 19CIV5075GBDSLC, 2020 WL 4936961 (S.D.N.Y. Aug. 24, 2020); *Poulos*, 2018 WL 3750508, at *4 ("Plaintiff's own declaration is admissible to demonstrate his damages.").

There are two documents that plaintiff submitted which, although admissible, merit additional discussion. The first is an affidavit from social worker Liana Kaplan, a Domestic Violence Counselor. (*See* Kaplan Aff.) Ms. Antoine proffered the Kaplan Affidavit to support her claim of emotional distress damages. Plaintiff testified at the inquest that, sometime after Henestroza attacked her, she moved out of the home she shared with her family and relocated to a shelter for abused women and their children. (Inquest Tr. 18-19.) Plaintiff met with Ms. Kaplan on four occasions, in April and May 2019, while staying at the domestic violence shelter with her son. (Kaplan Aff. ¶¶ 5-6.) Ms. Kaplan's affidavit does not purport to diagnose Ms. Antoine's mental condition. Instead, Ms. Kaplan relates plaintiff's self-described mental state.

(*Id.* ¶¶ 8-9.)   The Kaplan Affidavit is thus hearsay.   *See* Fed. R. Evid. 802.   Although it is hearsay, the Kaplan Affidavit is admissible under Federal Rule of Evidence 803(3), an exception to the rule against hearsay for statements concerning the declarant's "then-existing state of mind . . . or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . ."   Fed. R. Evid. 803(3).   Ms. Kaplan relates plaintiff's statement regarding the "anxiety and pain" that she was experiencing at the time, and how plaintiff's stay at the shelter was "exacerbat[ing] her depression and anxiety." (Kaplan Aff. ¶ 9.)   This statement falls squarely within the exception of Rule 803(3).   Accordingly, the Kaplan Affidavit is admissible to prove plaintiff's emotional state in the aftermath of quitting Brooklyn Maids.

The court will also consider Ms. Antoine's notes regarding her work schedule at Brooklyn Maids.   Under Federal Rule of Evidence 901(a), an item of evidence can be authenticated through the production of "evidence sufficient to support a finding that the item is what the proponent claims it is."   Digital evidence can be authenticated by, *inter alia*, testimony that the evidence is what the proponent claims it to be, or the evidence's "appearance, contents, substance, internal patterns, or other distinctive characteristics."   Fed. R. Evid. 901(b)(1) & (4).   Plaintiff testified that she kept a memo in

her phone documenting her hours and pay while employed with Brooklyn Maids.  (Inquest Tr. 13:3-8.)  Under penalty of perjury, plaintiff's counsel appended to his declaration, "[a] true and correct copy of notes taken by Ms. Antoine regarding her schedule."  (ECF No. 25-1, Supplemental Declaration of H. Joseph Cronen ("Cronen Supp. Decl.") ¶ 3.)  The contents and appearance of plaintiff's notes generally conform to her description at the inquest: they document the days she worked, how long she worked for, and how much she was paid.  (*See generally* Antoine Notes.)  In addition, the insignia atop the notes indicates the source was a notepad application on a Smartphone.  (*Id.*)  The Antoine Notes are therefore authenticated and admissible.

Having considered the admissible evidence, this court awards damages in the amounts stated and for the reasons discussed below.

## I.  Back Pay

Violations of "Title VII, NYSHRL, and NYCHRL entitle a plaintiff to compensatory damages for pecuniary loss as well as pain and suffering." *Moore v. Houlihan's Restaurant, Inc.*, No. 07 Civ. 3129(ENV)(RER), 2011 WL 2470023, at *4 (E.D.N.Y. May 10, 2011).  "Victims of employment discrimination are entitled to reasonable damages that would make the plaintiff 'whole for injuries suffered on account of unlawful employment

discrimination.'"  *Id.* (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1988)).  Under Title VII, the NYSHRL, and the NYCHRL, a plaintiff is generally, but not automatically, entitled to an award of back pay from the date of termination to the date of the judgment.  *DeCurtis v. Upward Bound Int'l, Inc.*, No. 09-CV-5378, 2011 WL 4549412, at *3 (S.D.N.Y. Sept. 27, 2011).

The complaint alleges that, following the March 1, 2019 incident, in which Henestroza choked plaintiff, she told him not to contact her again.  Plaintiff's affidavit, filed in connection with her motion for default judgment, elaborates that she quit her job with Brooklyn Maids at some point after March 1, 2019, citing fear for her physical safety.  (Antoine Aff. ¶¶ 20-21.)  Plaintiff further testified that she quit her job with Brooklyn Maids in "the first week of March."  (Inquest Tr. 16:11-12.)  In addition, the "intolerable" circumstances leading to plaintiff's departure amount to a constructive discharge by Brooklyn Maids.  *See Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003) ("An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily.") (citing *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 161 (2d Cir. 1998)).

At the damages inquest, plaintiff testified that at
the time of her exit, she had been working five days a week, for
ten hours a day.  (Inquest Tr. 17:4-6.)  Plaintiff noted that
this 50-hour workweek included ten hours overtime per week.
(*Id.*)  This testimony generally comports with the complaint,
which alleges plaintiff initially worked five days a week, from
8 a.m. to approximately 8:30 or 9:00 p.m., daily.  (Compl. ¶
15.)  Plaintiff told the court she was paid $990 each week, and
that Henestroza owed her "more than $5,000" in unpaid wages at
the time she quit.  (Inquest Tr. 17:7-13.)  According to
plaintiff, Henestroza generally paid her exclusively in cash
"because he decided he was going to budget my money for me."
(*Id.* 13:3-5.)  To document her time and unpaid wages, however,
plaintiff maintained records on her phone.  (*Id.* 13:6-8.)  Upon
the court's request, plaintiff agreed to make a copy of her
records and provide them to the court.  (*Id.* 17:14-20.)
Plaintiff's notes suggest she worked sixty hours per week
throughout February 2019, her last month of employment.  (*See*
Antoine Notes 3-4.)

Plaintiff also affirmed and testified to the myriad
circumstances that prevented her from obtaining new employment
after Brooklyn Maids.  Under Title VII, a prevailing plaintiff
forfeits her right to back or front pay if she fails to mitigate
damages by not using "reasonable diligence in finding other

suitable employment." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982).  The plaintiff's duty is "not onerous, and does not require [her] to be successful in mitigation." *Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir. 1997) (internal quotations and citations omitted).

Ms. Antoine states in her affidavit that, "I have attempted to get a new job, but I have not yet been hired anywhere." (Antoine Aff. ¶ 28.)  After Henestroza assaulted and threatened her with physical harm in March 2019, plaintiff moved from her home to a domestic violence shelter, where she received routine psychological treatment.  (*Id.* ¶¶ 26-27.)  At the time she moved in, she was suffering from "a lot of trauma," and two therapists were treating her.  (Inquest Tr. 25:4-5.)  During her six-month stay at the shelter, she was largely inhibited from seeking new employment due to the socially isolated conditions at the "safe house."  (*Id.* 25:9-13.)  Plaintiff's job search was further impeded by the need to attend to her child, who was six-years-old at the time.  (*Id.* 25:14-19.)  Further complicating matters, Ms. Antoine became pregnant in or around September 2019, and gave birth in April 2020.  (*Id.* 25:19-20; Antoine Aff. ¶ 33.)  Plaintiff attests she sought work, and applied for positions online, but ultimately could not work because she: (1) had a high-risk pregnancy, (2) had to walk her son to school in the mornings and there was no bus service available to her; (3)

had to pick her son up from school daily at 2:00 p.m.; and (4) had additional difficulty finding employment after the onset of the COVID-19 pandemic.  (Inquest Tr. 25:2-26:10.)

Under the circumstances, plaintiff has been practically foreclosed from gaining new employment after leaving Brooklyn Maids in March 2019.  Defendants also have not contested plaintiff's evidence of mitigation or submitted any contradictory evidence of their own.  *See Becerril v. E. Bronx NAACP Child Dev. Ctr.*, No. 08CIV.10283(PAC)KNF, 2009 WL 2611950, at *3-4 (S.D.N.Y. Aug. 18, 2009), *report and recommendation adopted sub nom. Becerril v. Ease Bronx NAACP Child Dev. Ctr.*, No. 08 CIV. 10283 PACKNF, 2009 WL 2972992 (S.D.N.Y. Sept. 17, 2009) (finding plaintiff mitigated damages).  Given the adverse circumstances that confronted plaintiff, it is reasonable and appropriate to conclude that she was reasonably diligent in her search for new employment and her efforts to mitigate her damages.

For these foregoing reasons, the court grants plaintiff's request for back pay.  Plaintiff affirms she earned $18 per hour working for Brooklyn Maids.  (Antoine Aff. ¶ 19.) Plaintiff's back pay request seeks to recover her weekly income of $990, based on her regular 40-hour workweek, plus ten hours

of weekly overtime at a rate of time-and-a-half.[8]  This request

is reasonable and appropriate.  Accordingly, plaintiff is

entitled to $990 per week, dating from March 1, 2019 to the

September 26, 2020, *i.e.*, 82 weeks.  Plaintiff is thus awarded

total back pay of **$81,180.00.**

## II.   Prejudgment Interest on Back Pay

"While the decision to award prejudgment interest is

left to the discretion of the district courts, the Second

Circuit has stated that '[t]o the extent . . . that damages

awarded to the plaintiff represent compensation for lost wages,

it is ordinarily an abuse of discretion not to include

prejudgment interest.'"  *Shannon v. Fireman's Fund Ins. Co.*, 136

F. Supp. 2d 225, 230 (S.D.N.Y. 2001) (quoting *Gierlinger v.

Gleason*, 160 F.3d 858, 873 (2d Cir. 1998)).  Under federal law,

the applicable interest rate is the "the average rate of return

on one-year Treasury bills ('T-bills') for the relevant time

period."  *Kuper v. Empire Blue Cross & Blue Shield*, No. 99 Civ.

1190(JSG)(MHD), 2003 WL 23350111, at *3 (S.D.N.Y. Dec. 18,

2003).  Under New York law, "[interest shall be at the rate of

---

[8]     Plaintiff earned $720 per week based on her regular $18 per hour pay
rate and 40-hour workweek.  Plaintiff earned, but was not paid, an additional
$270 per week for ten hours of weekly overtime at a rate of one-and-a-half
times her regular rate.  *See Nakahata v. New York-Presbyterian Healthcare
Sys., Inc.,* 723 F.3d 192, 200 (2d Cir. 2013) ("The FLSA mandates that [a
covered employee] be compensated at a rate of no less than one and one-half
times the regular rate of pay for any hours worked in excess of forty per
week.") (citing 29 U.S.C. § 207(a)); *Fermin v. Las Delicias Peruanas Rest.,
Inc.,* 93 F. Supp. 3d 19, 43 (E.D.N.Y. 2015) (same standard under New York
Labor Law) (citing *Nakahata,* 723 F.3d at 200).

nine per centum per annum, except where otherwise provided by statute." CPLR § 5004. Where, as here, a judgment is "based on both state and federal law with respect to which no distinction is drawn," the applicable interest rate shall be "the federal interest rate." *Thomas v. iStar Fin., Inc.*, 629 F.3d 276, 280 (2d Cir. 2010). The court therefore disregards plaintiff's request for prejudgment interest at New York's statutory rate of nine percent per annum (*see* Pl.'s Supp. Br. 2-3), and awards interest under federal law. Interest will also be compounded annually, in order to guarantee plaintiff is completely compensated. *See Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998).

"The award of prejudgment interest should be calculated from the time the claim arises through the date of judgment." *Joseph*, 970 F. Supp. 2d at 151. The following methodology applies:

> First, the backpay award should be divided pro rata over the appropriate time period. Second, once the award is divided, the average annual United States treasury bill rate of interest referred to in 28 U.S.C. § 1961 will be applied. Third and finally, in order to guarantee complete compensation to the plaintiff, the interest will be compounded annually.

*Id.* at 151 (citations and alterations omitted).

Based on the foregoing, plaintiff is granted pre-judgment interest on her total back pay award of $81,887.00. The Clerk of the Court is directed to award prejudgment interest

using the foregoing methodology.  Because the back pay and relevant pre-judgment time periods coincide, prejudgment interest shall be awarded from March 1, 2019, the date plaintiff was constructively terminated, through to the date of entry of judgment.  The Clerk shall apply the average annual United States T-bill rate of interest for the period March 1, 2019 to September 30, 2020, as referred to in 28 U.S.C. § 1961.  The Clerk may utilize the government website,

http://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/default.aspx (last visited Sept. 25, 2020), to ascertain the applicable rate.[9]  Finally, the interest should be compounded annually.

**III.   Front Wages**

The court has the discretion to award front wages to a prevailing plaintiff under Title VII, the NYSHRL, and the NYCHRL.  *Becerril*, 2009 WL 2611950, at *5; *see also Santiago v. Crown Heights Ctr. for Nursing & Rehab.*, No. 15CV4381DLICLP, 2017 WL 9482107, at *22 (E.D.N.Y. Feb. 24, 2017), *report and recommendation adopted as modified*, No. 15CV4381DLICLP, 2017 WL 4410807 (E.D.N.Y. Sept. 30, 2017) (awarding front wages under federal, state, and city law); *cf. Morse v. JetBlue Airways Corp.*, No. 09-CV-5075 KAM MDG, 2014 WL 2587576, at *3 (E.D.N.Y.

---

[9]     The Clerk may also utilize the Federal Reserve website, https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H.15 (last visited Sept. 25, 2020).

June 9, 2014) (applying same substantive analysis for entitlement to front wages under Title VII, NYSHRL, and NYCHRL). "Front pay is an equitable remedy available to prevailing [] plaintiffs, and is generally understood to be an award for lost compensation for the period between judgment and reinstatement." *Whitten v. Cross Garage Corp.*, No. 00 CIV.5333 JSM FM, 2003 WL 21744088, at *4 (S.D.N.Y. July 9, 2003) (citing *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2000), and *Pollard v. E.I. duPont de Nemours & Co.*, 532 U.S. 843, 848 (2001)). In essence, "front pay helps make a discharged employee whole." *Id.*

The efficacy of front pay depends on three considerations, specifically, "(1) whether reinstatement is either impossible or impracticable; (2) whether the plaintiff has a reasonable prospect of obtaining comparable employment; and (3) whether the calculation of front pay would involve undue speculation." *Shannon*, 136 F. Supp. 2d at 233 (citing *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728-29 (2d Cir. 1984)). Turning to the first inquiry, reinstatement is impracticable, if not impossible. In their last encounter, Henestroza assaulted and threatened plaintiff, prompting her to quit in fear of her safety. Even if she could be reinstated, it would not be fair to expect plaintiff to return to Brooklyn Maids under the circumstances.

Second, plaintiff does not have a reasonable prospect of obtaining comparable employment.  This inquiry centers on mitigation.  "[A] prevailing plaintiff forfeits her right to . . . front pay if she fails to mitigate damages by not using 'reasonable diligence in finding other suitable employment.'" *Becerril*, 2009 WL 2611950, at *3 (quoting *Ford Motor Co.*, 458 U.S. at 231).  Plaintiff sought employment as diligently as could be expected, in light of the adversity she encountered after March 1, 2019.  Moreover, the court anticipates that plaintiff will encounter substantial difficulty securing employment for the foreseeable future.  Plaintiff is 37 years old, and has an Associate's Degree from Atlantic Union College. (Inquest Tr. 6:2-6.)  She is saddled with significant childcare burdens, and has spent much of the last eighteen months in domestic violence shelters.  She is confronting numerous mental and emotional health conditions.  As if these circumstances did not present enough obstacles to seeking and obtaining employment, the job market has shriveled drastically due to the COVID-19 pandemic.

Finally, calculating appropriate front pay does not entail undue speculation.  Plaintiff seeks front pay for a period of two years.  (Pl.'s Mem. 16.)  A two-year award of front pay, based on the difference between plaintiff's past and current earnings, is customary.  *See, e.g.*, *Santiago*, 2017 WL

9482107, at *22 (awarding two years of front pay by adding two years of pay at plaintiff's former annual salary, less mitigation earnings); *cf. Osorio v. Source Enters., Inc.*, No. 5 Civ. 10029 (JSR), 2007 WL 683985, at *6 (S.D.N.Y Mar. 2, 2007) (affirming that "a five-year front pay award was not unduly speculative or excessive" because plaintiff had "'no reasonable prospect of obtaining comparable alternative employment' within the next five years").  The court finds two years' front pay is appropriate and non-speculative given the formidable obstacles that confront plaintiff.

The court will therefore award plaintiff **$98,961.00**, which accounts for two years' front pay at plaintiff's base salary, or $102,960.00, discounted to its present value.[10]  *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1189 (2d Cir. 1992) ("[A]n award of front pay should be discounted to its present value."); *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 578 (S.D.N.Y. 2011) (reducing front pay award to present value at agree-upon discount rate).

---

[10]    The court applied a 2% discount rate in order to calculate the "present value of a lost stream of earnings in an inflation-free economy." *Ammar v. United States*, 342 F.3d 133, 148 (2d Cir. 2003) ("Where the parties have adduced no evidence relating to the discount rate and there has been no upward adjustment of the undiscounted lost wages figure to cover future inflation, this Court has authorized district judges to use a discount rate of 2% per year.").

**IV.   Emotional Distress Damages**

Plaintiff seeks a "substantial emotion distress award" for pain and suffering, past and future.  (Pl.'s Supp. Br. 6.) Courts in this district have adopted a three-tiered approach to emotional distress damages, depending on whether the case is "garden-variety," "significant," or "egregious."  *See Setty*, 2018 WL 8415414, at *16.  "This approach has been used in damages inquests on default judgments as well as in reviews of jury verdicts."  *Gutierrez v. Taxi Club Mgmt., Inc.*, No. 17CIV532AMDVMS, 2018 WL 3432786, at *9 (E.D.N.Y. June 25, 2018), *report and recommendation adopted sub nom. Gutierrez v. Taxi Club Mgmt., Inc.*, No. 17CV0532AMDVMS, 2018 WL 3429903 (E.D.N.Y. July 16, 2018).

For "garden-variety" emotional distress claims, where plaintiff "did not seek medical treatment but [] the evidence in the form of plaintiff's testimony describes shock, nightmares, sleeplessness, humiliation, and other subjective distress," *Santiago*, 2017 WL 9482107, at *23, courts have awarded damages ranging from $5,000 to $35,000.  *See, e.g.*, *Joseph*, 970 F. Supp. 2d at 153-54 (awarding plaintiff $30,000 in emotional distress damages where plaintiff's allegations of emotional distress were "significant but [were] stated as conclusions drawn by the Plaintiff herself[] [w]ithout any medical documentation[.]"). For a "significant" emotional distress claim, where a plaintiff

has suffered "more substantial harm, usually evidenced through medical testimony or documentation," *Joseph*, 970 F. Supp. 2d at 153 (internal quotations and citations omitted), courts have awarded damages ranging from $50,000 to $100,000.  *Rainone v. Potter*, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005); *see, e.g.*, *Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35, 47-49 (E.D.N.Y. 2009) (upholding award of $100,000 where plaintiff had documented medical evidence that she suffered from depression, lack of sleep, powerlessness, and lack of motivation); *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 67-68, 73-74 (E.D.N.Y. 2002) (reducing a jury award of $150,000 to $50,000 for a plaintiff who established "numerous instances where managers made disparaging remarks about African Americans" and a negative effect on his personal and professional life, but who did not pursue a course of psychological treatment).  Finally, in egregious cases, "where the discriminatory conduct was outrageous and shocking *or* where the physical health of plaintiff was significantly affected," damages have been awarded in excess of $100,000.  *Setty*, 2018 WL 8415414, at *17 (emphasis added) (quoting *Rainone*, 388 F. Supp. 2d at 123).  Adjusting the values above for inflation,[11] results in the following scale:

---

[11]     In *Gutierrez*, Judge Scanlon noted in her Report and Recommendation, thereafter adopted, that the prescribed damages ranges for emotional distress claims were based on *Rainone*, which was decided in 2005.  *Gutierrez*, 2018 WL 3432786, at *9 (citing *Rainone*, 388 F. Supp. 2d at 122).  Taking a cue from *Gutierrez*, the court has applied the Bureau of Labor Statistics' ("BLS")

$6,500 to $46,000 for "garden-variety" cases; $65,000 to $131,000 for "significant" cases; and above $131,000 in "egregious" cases.

Given Mr. Henestroza's outrageous and shocking conduct, this is an egregious case. At the inquest, Ms. Antoine provided a harrowing account of the physical and emotional abuse, and threats by Henestroza. Mr. Henestroza made his initial, inappropriate advances in January 2019, when Ms. Antoine was assigned to clean his Queens apartment. (Inquest Tr. 8:18-25.) Henestroza took plaintiff into his room and told her "this is where all the magic happens." (*Id.* 9:2-6.) He inappropriately asked plaintiff about her sexual activities and boasted about the size of his penis. (*Id.* 9:7-9.) After driving plaintiff home, Henestroza sent her text messages professing his desire to date her. (*Id.* 9:12-14.) Henestroza repeated his boasts about his penis size and sexual prowess. (*Id.* 9:14-16.) Ms. Antoine rebuffed his overtures, and advised that she wished simply to "work and keep it professional." (*Id.* 9:19-20.) Regardless, Henestroza continued to harass plaintiff on subsequent occasions when she cleaned his apartment, which made her "uncomfortable." (*Id.* 9:24-10:2.)

---

Consumer Price Index ("CPI") inflation calculator to adjust the aforementioned amounts for inflation from September 2005, when *Rainone* was decided, to August 2020, the last date for which BLS computes the CPI adjustment. *See* CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm (last visited Sept. 25, 2020).

In February 2019, Henestroza joined plaintiff on a cleaning assignment in Manhattan.  (Inquest Tr. 10:3-7.)  What ensued was tantamount to rape:

> **Counsel:** What happened when you were cleaning the apartment?
>
> **Plaintiff:** So I went in the apartment and I had to -- he came upstairs and he locked his door, and then he pushed me on the bed, and I had on some spandex pants, and he pulled down my pants and he just started -- he got on top of me and he started having sex with me. It was like really aggressive force, like pushing me down on the bed and overpowering me.
>
> **Counsel:** I'm so sorry to hear that. Did you tell him to stop?
>
> **Plaintiff:** Yes.
>
> **Counsel:** Did he?
>
> **Plaintiff:** He did not stop until he was done and he came and he got up and, you know, got dressed and walked out.

(*Id.* 10:10-21.)

Afterward, Henestroza drove plaintiff home.  (Inquest Tr. 11:4.)  Ms. Antoine was outwardly distraught by Henestroza's assault.  (*Id.* 11:5-7 ("I was upset. I got in the car. I was screaming. I was furious. So I was just like cursing him out, like how could you do something like that.").)  Henestroza, however, was conspicuously indifferent to plaintiff's distress. (Id. 11:7-11 ("He just didn't care. Like, I was in the car. I was crying. Like, I was very emotional. I just felt like that -- I was in a shock of state that he would do something like that,

but he didn't care. He was just laughing.").)  In the weeks that followed, Henestroza reduced plaintiff's work and withheld her pay.  (*Id.* 11:13-17.)  Plaintiff testified that Henestroza required her to have sex with him as a condition to paying her wages.  (*Id.* 11:16-20.)

Fed up with her treatment, plaintiff confronted Henestroza at his apartment in early March 2019, to demand he resume regularly paying her wages.  (Inquest Tr. 12:2-4.) Henestroza reacted violently, plaintiff recalled:

> So he got really angry. He threw me against the wall and started choking me. Then he told me I used to kill animals when I was a kid. Do you know what I could do to you? After that, I was like take me home. So he drove me home in the car. He was threatening to kill me. He's like oh, I know where you live. I know where your family live.  You don't know what I'm capable of doing, you got to like watch yourself.

(*Id.* 12:4-12.)  The attack left Ms. Antoine in fear for her safety, and that of her family's.  (*Id.* 12:14-16.)  About two days later, Henestroza appeared at plaintiff's home, and threatened her.  (*Id.* 18:11-17.)  Plaintiff responded by calling the police and obtaining an order of protection against Henestroza.  (*Id.* 18:19-21.)

After Henestroza threatened plaintiff at her home, she "had to go to . . . a safe house[.]"  (Inquest Tr. 18:24-25.) Plaintiff moved to a domestic violence shelter with her son in mid-March, and lived there until September 2019, at which point

she moved to a different shelter. (*Id.* 19:4-8.)  Plaintiff has

received therapy at each shelter, and states was diagnosed with

anxiety, bipolar disorder, trauma, post-traumatic stress

syndrome, and significant depression. (*Id.* 21:1-4.)  She was

also taking the anti-depressants Trazodone and Remron, but is no

longer on those medications. (*Id.* 21:6-7.)

      Plaintiff described how Henestroza's assault and other

threatening conduct has impacted her emotionally:

> [I]t has made me very stressed out. A lot of stress,
> loss of sleep. I lost a lot of weight. I'm having
> nightmares. I'm scared. Every time I go out now I'm
> like always paranoid because I don't know if I can run
> into him and I'm scared for my family, my sister. I
> haven't seen my family in 14 months. I haven't seen my
> mom or my sister.
>
> I try to avoid going where the incident happened when
> he came to our house. I have like, you know, a lot of
> trauma. My son, you know, I'm worried about him
> because he's very sad, you know, since we had to move
> and go hide and stuff. He kind of knows like what's
> going on and it is affecting him. You know, I feel
> like I'm powerless. I can't provide for my kids. I
> don't have a job. I don't have no money and it's like
> -- I feel like I can't protect myself. I'm not safe
> anywhere.

(Inquest Tr. 21:21-22:10.)

      Although the court credits plaintiff's testimony, her

lack of corroboration must be acknowledged.  Plaintiff did not

offer any corroborating witnesses at the inquest.  After the

hearing, plaintiff's counsel submitted a sealed affidavit from

Ms. Liana Kaplan, a Domestic Violence Counselor at plaintiff's

shelter residence after March 2019.  Although admissible, the
Kaplan Affidavit is not entirely illuminating.  Ms. Kaplan did
not provide any diagnostic information about plaintiff's mental
or emotional condition, despite having treated her on four
occasions.  (Kaplan Aff. ¶ 8 (noting plaintiff's shelter "does
not make diagnoses").)  Instead, she merely relates plaintiff's
self-described medical conditions and history.  Nor does the
affidavit specifically connect plaintiff's mental health
difficulties to the events in question.  Ms. Kaplan recalled
plaintiff telling her that "she was experiencing increased
anxiety and depression while she was at the [shelter]," and
"specifically recall[ed] [plaintiff] saying that being forced to
live in a shelter, along with her son, exacerbated her
depression and anxiety."  (*Id.* ¶ 9.)  But if plaintiff told Ms.
Kaplan how Henestroza's abuse led to her predicament, Ms. Kaplan
neglected to state that in her affidavit.  As a result, the
affidavit is of minimal utility in connecting defendants'
conduct to plaintiff's emotional distress, notwithstanding
plaintiff's own credible testimony at the inquest hearing.

      In light of Mr. Henestroza's egregious conduct, and
having considered and credited plaintiff's testimony, which is
uncontested, the court awards emotional distress damages of
$200,000.  This award recognizes the shocking, likely criminal
nature of Henestroza's actions, and the credibly traumatic

impact of those actions on plaintiff's physical and mental well-
being.  Plaintiff credibly testified that Henestroza subjected
her to an escalating pattern of abuse and threats.  What began
in the confines of Henestroza's home, with extremely
inappropriate remarks, laced with sexual innuendo and overtures,
evolved to sexual assault, violent choking, and threats to
plaintiff and her family's lives.  Henestroza's sadistic conduct
had a crippling effect on plaintiff, emotionally and mentally.
She suffered stress, weight loss, sleeplessness, paranoia,
depression, hopelessness, and fear.

At the same time, the award above also accounts for
plaintiff's lack of corroboration.  Although Ms. Kaplan's
affidavit confirms that plaintiff resided at a domestic violence
shelter with her son shortly after her final, violent encounter
with Henestroza, there is no corroborating evidence regarding
plaintiff's mental health diagnoses, medications, and other
factors that would support a more significant award of damages
for emotional distress.  The Report and Recommendation in *Offei
v. Omar*, thereafter adopted, serves as a helpful guidepost in
this context.  No. 11 Civ. 4283 (SAS) (MHD), 2012 WL 2086294, at
*7 (May 18, 2012), *report and recommendation adopted*, No. 11
Civ. 4283 (SAS) (MHD), 2012 WL 2086356 (S.D.N.Y. June 8, 2012).
In *Offei*, the plaintiff obtained a default judgment and was
awarded $250,000 in damages for a one-time incident of sexual

assault.  *Id.*  Ms. Offei experienced severe emotional distress that required her to take anti-anxiety medication on a daily basis.  *Id.* at *2. Dr. Boland, a clinical psychologist who treated Offei after her assault, provided ample corroboration for plaintiff's account.  *Id.* at *3.  At the damages inquest, Dr. Boland testified about Offei's range of anxiety-related conditions, and identified the assault as a cause of her symptoms.  *Id.* at *3-4.

Ms. Antoine, by contrast, suffered prolonged, severe physical and verbal abuse that spanned several months.  On the other hand, her lack of corroboration warrants restraint when awarding damages.  The court finds that an award of **$200,000** strikes a proper balance between the traumatic abuse plaintiff suffered and the near-complete absence of corroborating evidence.  This award comports with sums awarded in similar situations, and falls within the generally accepted spectrum of emotional distress damages, given the nature of the abuse, the harm inflicted, and the level of corroboration.  *E.g.*, *Garcia v. Comprehensive Ctr., LLC*, No. 17 Civ. 8970 (JPO) (BCM), 2019 WL 8274296, at *7-8 (S.D.N.Y. Nov. 21, 2019) (awarding $175,000 in emotional distress damages to plaintiff who "suffered physical violence, harassment, and discrimination for more than a year, leading to psychological treatment" including therapy and medication for diagnoses of PTSD and major depressive disorder),

*report and recommendation adopted*, 2020 WL 1435002 (S.D.N.Y. Mar. 24, 2020); *Gutierrez*, 2018 WL 3432786, at *9–10 (recommending $130,000 emotional distress award where plaintiff endured severe and intense sexually harassing behavior that caused her migraine headaches, nausea, vomiting, sleep disorders, and anxiety lasting for over 18 months); *Mayo-Coleman v. Am. Sugar Holdings, Inc.*, No. 14 Civ. 79 (PAC), 2018 WL 2684100, at *3, 5 (S.D.N.Y. June 5, 2018) (reducing emotional distress award from $1.7 million to $500,000 as "the greatest amount that can be awarded without being excessive" where plaintiff had both psychological and physical manifestations resulting from extreme sexual harassment); *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 334 (S.D.N.Y. 2016) (reducing a $500,000 jury award to $150,000 where a plaintiff suffered significant emotional distress); *Caravantes v. 53rd St. Partners, LLC*, No. 09 Civ. 7821 (RPP), 2012 WL 3631276, at *24 (S.D.N.Y. Aug. 23, 2012) (awarding $150,000 in compensatory damages where emotional distress was significant); *Thorsen v. Cty. of Nassau*, 722 F. Supp. 2d 277, 295 (E.D.N.Y. 2010) (reducing a $1,500,000.00 award to $500,000.00 for "significant" damages evidenced by the plaintiff's testimony and the testimony of his treating psychologist regarding the plaintiff's hospitalization for a "major stress attack"); *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 370–71 (S.D.N.Y. 2001) (upholding

jury's emotional distress damages award of $400,000 where
plaintiff suffered "permanent mental disabilities" and was
unable to work as a result of defendant's sexual harassment).

## V.   Punitive Damages

Plaintiff also seeks a "significant" punitive damages
award, "[g]iven the abhorrent and shocking nature" of
Henestroza's behavior.  (Pl.'s Supp. Br. 8.)   A prevailing party
is entitled to punitive damages under Title VII and the NYSHRL
where defendants "engaged in intentional discrimination . . .
with malice or reckless indifference to [plaintiff's] federally
protected rights." *Zimmermann v. Assocs. First Capital Corp.*,
251 F.3d 376, 384 (2d Cir. 2001).   A plaintiff is entitled to
punitive damages under the NYCHRL where "the wrongdoer's actions
amount to willful or wanton negligence, or recklessness, or
where there is a conscious disregard of the rights of others or
conduct so reckless as to amount to such disregard." *Chauca v.
Abraham*, 30 N.Y.3d 325, 329 (2017) (internal quotation marks and
citation omitted).   Title VII limits compensatory and punitive
damages, excluding back pay, to $50,000 for employers such as
Brooklyn Maids who have one hundred or fewer employees.  *See* 42
U.S.C. § 1981a(b)(3)(A); *Hawkins v. 1115 Legal Serv. Care*, 163
F.3d 684, 691 (2d Cir. 2008).[12]   The NYSHRL does not explicitly

---

[12]   The complaint states that Brooklyn Maids employs at least 15 or more
employees.  (Compl. ¶ 8.)

provide for punitive damages.  N.Y. Exec. Law § 297(9).  The

NYCHRL, on the other hand, imposes no limit on the amount of

punitive damages a court may award.  N.Y. Admin. Code. § 8-

502(a).  Punitive damages are also recoverable in an action for

assault and battery under New York law, and "may be assessed

where a defendant's actions evince a high degree of moral

culpability or demonstrate a wanton or reckless disregard for

the rights of the plaintiff."  *Solis-Vicuna v. Notias*, 71 A.D.3d

868, 871 (N.Y. App. Div. 2d Dep't 2010); *see Matthews v.*

*Garrett*, 303 A.D.2d 563, 563 (N.Y. App. Div. 2d Dep't 2003).

> The Second Circuit has recognized that:

> > [a]wards of punitive damages are by nature
> > speculative, arbitrary approximations. No objective
> > standard exists that justifies the award of one
> > amount, as opposed to another, to punish a tortfeasor
> > appropriately for his misconduct. Nor is there any
> > formula to determine the dollar amount needed to
> > effectuate deterrence.

*Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013).  That said, the

Supreme Court has delineated several factors for courts to

consider in assessing the reasonableness of punitive damages,

including: "(1) the degree of reprehensibility of the

defendant's conduct; (2) the difference between the actual or

potential harm suffered by the plaintiff and the punitive

damages award; and (3) the difference between the punitive

damages awarded and the civil penalties imposed in comparable

cases."  *DeCurtis v. Upward Bound Int'l, Inc.*, No. 09 Civ. 5378

(RJS), 2011 WL 4549412, at *5 (S.D.N.Y Sept. 27, 2011) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). In addition, no matter how egregious the underlying conduct, the court is required to consider the defendant's financial circumstances in determining an award of punitive damages. *Patterson v. Balsamico*, 440 F.3d 104, 121 (2d Cir. 2006).

The court agrees with plaintiff that defendants' conduct merits sizeable punitive damages. Henestroza's actions were unquestionably reprehensible. Without rehashing plaintiff's detailed testimony in its entirety, it is clear that Henestroza acted with malice and utter disregard for plaintiff's rights. Henestroza sexually assaulted Ms. Antoine. He attacked her, strangled her, and threatened her life and the lives of her family. Plaintiff testified that Henestroza merely laughed when she confronted him about his egregious behavior, and even retaliated by docking her hours. Moreover, he leveraged his authority as CEO and his control over plaintiff's work schedule and compensation to withhold her pay, apparently in order to compel sexual favors from her. Mr. Henestroza's conduct was therefore not only personally reprehensible. As an employer, he abused his position of trust for unseemly, if not illegal, ends.

In sexual assault cases, courts in this Circuit frequently award punitive damages that are equal to or less than compensatory damages. *See Mathie v. Fries*, 121 F.3d 808, 818 (2d

Cir. 1997) (punitive less than compensatory); *Doe v. HRH Prince Abdulaziz Bin Fahd Alsaud, Saudi Oger Ltd.*, No. 13-CV-571 (RWS), 2017 WL 4541426, at *3 (S.D.N.Y. Oct. 10, 2017) (same); *Amador v. Galbreath*, No. 10-CV-6702, 2013 WL 1755784, at *3 (W.D.N.Y. Apr. 24, 2013) (one-to-one ratio of punitive to compensatory); *Ortiz v. Lasker, Jr.*, No. 08-CV-6001, 2010 WL 3476017, at *2 (W.D.N.Y. Aug. 30, 2010) (same); *Cash v. Cty. of Erie*, No. 04-CV-0182 (JTC) (JJM), 2009 WL 3199558, at *3 (W.D.N.Y. Sept. 30, 2009) (punitive less than compensatory).  The court roughly adheres to the one-to-one punitive-to-compensatory ratio here, with only slight modification.[13]

Imposing a punitive damage award of $375,000 is appropriate under the circumstances presented here.  This award falls within the broad range of punitive damage awards ordered in like cases.  *See, e.g.*, *Mathie*, 121 F.3d at 818 (award of $250,000 in compensatory damages and $200,000 in punitive damages is appropriate where corrections officer sexually abused and forcibly sodomized inmate); *Noonan v. Becker*, 14 CV 4084, 2018 WL 1738746, at *9 (S.D.N.Y. Apr. 10, 2018) (awarding $1,000,000 in punitive damages against defaulting defendant police officer based on unchallenged factual allegations of deliberate and outrageous conduct, including false arrest,

---

[13]    Leaving aside interest, plaintiff's total compensatory damages, including back pay, front pay, and emotional distress damages, amounts to $380,141.

prosecution of false charges, sexual assault, battery and rape), *report and recommendation adopted*, 2018 WL 2088279 (S.D.N.Y. May 3, 2018); *Offei*, 2012 WL 2086294, at *8 ($100,000 in punitive damages for one-time sexual assault); *Ortiz*, 2010 WL 3476017, at *2 (awarding $250,000 in compensatory and $250,000 in punitive damages to inmate raped twice by corrections officer); *Cash*, 2009 WL 3199558, at *4 (reducing jury punitive award to $150,000 for prisoner raped by corrections officer); *Deborah S. v. Diorio*, 153 Misc.2d 708, 715 (N.Y. Civ. Ct. 1992) (punitive award of $200,000 to victim of date rape).

Finally, the court notes that, by defaulting, defendant has surrendered the opportunity to demonstrate that his financial circumstances should constrain the amount of any such award. *See Mathie*, 121 F.3d at 816 ("Under well established precedent in this Circuit, 'it is the defendant's burden to show that his financial circumstances warrant a limitation of the award.'") (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 373 (2d Cir. 1988)).

Accordingly, the court grants plaintiff's request for punitive damages in the amount of **$375,000**.

## VI. Post-Judgment Interest

Post-judgment interest shall be imposed "on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). This interest rate is calculated "from the

date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment," and "shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually." *Id.* (a)-(b).  The amount upon which the post-judgment interest accrues "includes compensatory damages, punitive damages, and fee awards." *Koch v. Greenberg*, 14 F. Supp. 3d 247, 287 (S.D.N.Y. 2014) (citations omitted).

The court grants plaintiff's motion for post-judgment interest on plaintiff's awards of compensatory damages, punitive damages, and the attorneys' fees and costs.  The Clerk of Court shall calculate post-judgment damages as instructed above from the date of the entry of judgment.

### ATTORNEYS' FEES AND COSTS

Plaintiff requests $12,631.25 in attorneys' fees and $655 in costs.  (Pl.'s Supp. Br. 14.)  A party prevailing under Title VII and the NYCHRL is entitled to reimbursement of attorneys' fees at the discretion of the court.  42 U.S.C. § 2000e-5(k); N.Y.C. Admin. Code § 8-502(g); *DeCurtis*, 2011 WL 4549412, at *6.  Since the Title VII and NYCHRL provisions are "substantively and textually similar . . . the reasonableness of

fees [are] analyzed the same regardless of which provision provides [plaintiff's] recovery." *Houlihan's Rest.*, 2011 WL 2470023, at *7 n.10.

Courts in the Second Circuit calculate a "'presumptively reasonable fee' by taking the product of the hours reasonably expended and a reasonable hourly rate that reflects 'what a reasonable, paying client would be willing to pay.'" *Setty*, 2018 WL 8415414, at *19 (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 183-84 (2d Cir. 2008)). "A reasonable hourly rate is generally calculated by reference to the prevailing hourly rates in the district where the court sits for attorneys of comparable skill, experience, and reputation." *Setty*, 2018 WL 8415414, at *19 (internal quotation marks omitted). Accordingly, counsel must present time records that are itemized, for each attorney, by date, hours worked, and nature of work performed. *Id.*

"Courts in this District have approved the following hourly rates for attorneys practicing in the Eastern District of New York: $300 to $450 for partners in law firms, $200 to $325 for senior associates, and $100 to $200 for junior associates." *PNC Equip. Fin., LLC v. Montauk Transp. Serv. Inc.,* No. 18-CV5883, 2019 WL 8685091, at *4 (E.D.N.Y. Dec. 16, 2019), *report and recommendation adopted*, No. 18-CV-5883, 2020 WL 2219197 (E.D.N.Y. May 7, 2020); *Castcapa Constr., LLC v. TMB Servs.,*

*LLC*, No. 17-CV-1023, 2018 WL 623546 (E.D.N.Y. Jan. 30, 2018) (junior associates are "typically compensated at between $100 to $200 per hour"); *Thomas v. City of N.Y.*, No. 14-CV-7513, 2017 WL 6033532, at *5 (E.D.N.Y. Dec. 1, 2017) ("An hourly rate of $450 remains within the range of rates found reasonable for partners with twenty or more years of experience in this District."); *Smart v. City of N.Y.*, No. 15-CV-1405, 2017 WL 933080, at *3 (E.D.N.Y. Feb. 17, 2017) ("In recent years, fees have been awarded in the Eastern District of New York at an hourly rate of $300 to $450 for partners and $100 to $325 for associates in civil rights cases.").  Courts in this District have also approved hourly rates for paralegals ranging from $70 per hour to $100 per hour, while the average rate is $75 per hour.  *Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp.,* No. 11-CV-3652, 2014 WL 887222, at *6 (E.D.N.Y. Jan. 6, 2014) (citing *Juarez v. Precision Apparel, Inc.*, No. 12-CV-2349 ARR VMS, 2013 WL 5210142, at *14 (E.D.N.Y. Sept. 13, 2013) (collecting Eastern District cases)).

The court has reviewed the qualifications of plaintiff's attorneys and support staff, set forth in the Supplemental Cronen Declaration, and counsel's contemporaneous billing records (ECF No. 25-3, Billing Records), and finds plaintiff's request for attorneys' fees and costs to be

reasonable.  The chart below reflects each attorney and staffer's hourly rate, hours committed, and total fee:

| Attorney/Staff | Rate | Hours Rendered | Total |
|---|---|---|---|
| Shawn Clark, Esq. | $325.00 | 11.25 | $3,656.25 |
| H. Joseph Cronen, Esq. | $250.00 | 32.5 | $8,125.00 |
| Samantha Cassinelli, Paralegal | $100.00 | 6.7 | $670.00 |
| Candy Hernandez, Paralegal | $100.00 | 0.4 | $40.00 |
| Madonna Isaac, Paralegal | $100.00 | 1.4 | $140.00 |
| | | | $12,631.25 |

(Cronen Supp. Decl. ¶ 6.)

Based on their credentials and experience, the court finds that each attorney and staffer's hourly rate, which uniformly fall within recognized lodestars, is appropriate. Shawn Clark, Esq., is a Senior Associate at Phillips & Associates and his requested hourly rate is $325.00.  He has ten years' experience as a practitioner, including positions in the Legal Bureau of the NYPD, and the Special Federal Litigation Division of the New York City Law Department.  He has significant experience in employment and discrimination matters, including a number of trials.  (Cronen Supp. Decl. ¶ 8.)  Mr. Cronen has been practicing law since 2012.  (*Id.* ¶ 9.)  His practices include labor and employment, police misconduct, and personal injury.  (*Id.*)  In 2015, he was second chair in a personal injury trial in Bronx County Supreme Court and prepared the plaintiff for direct examination.  (*Id.*)  Likewise, the

66

paralegals, Ms. Cassinelli, Ms. Hernandez, and Ms. Isaac, each have commendable experience and credentials.  (*Id.* ¶¶ 10-12.)

After thoroughly reviewing counsel's billing records, the court further finds that the hours expended are reasonable and appropriate.  Notably, in preparing the fee application, counsel removed vague and duplicative entries and reduced the time expended on certain tasks.  (Cronen Supp. Decl. ¶ 7.) Counsel also excised time entries for one associate who was primarily occupied with administrative work.  (*Id.*)  Plaintiff's billing records are itemized by date, task, the time each task began, and duration of each task in increments of tenths of an hour.  (*See generally* Billing Records.)  The entries substantially consist of time spent drafting and filing the summons and complaint, serving the summons and complaint, discussing the details of the complaint with the plaintiff, preparing and filing the case in the EEOC,[14] preparing calculations of damages and drafting a demand letter, moving for an entry of a default, preparing proof of damages, drafting the motion for default judgment, preparing Ms. Antoine to testify at the inquest, appearing at the inquest, and preparing the supplemental damages submissions.  (*See generally* Billing

---

[14]    Fees for time spent in connection with proceedings before the EEOC are recoverable.  *See New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 61-64 (1980) (holding that Title VII allows for recovery of attorneys' fees and costs incurred in administrative proceedings prior to suit being brought in federal court).

Records; *see also* Cronen Supp. Decl. ¶ 5.)  Accordingly, plaintiff's counsel has demonstrated that the fees requested are reasonable.

Plaintiff may also recover her costs, namely, a $400 fee for filing the complaint, and $255 expended for process servers.  "[A]ttorneys' fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *Rhodes v. Davis*, No. 08-CV-9681 (GBD), 2015 WL 1413413, at *4 (S.D.N.Y. Mar. 23, 2015) (quoting *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998)).  "Court fees reflected on the Court's docket and costs for which a claimant provides extrinsic proof, such as an invoice or receipt, are considered sufficiently substantiated, as is a sworn statement or declaration under penalty of perjury that certain amounts were expended on particular items." *Mendoza v. CGY & J Corp.*, 2017 WL 4685100, at *3 (S.D.N.Y. Oct. 17, 2017) (citing *Abel v. Town Sports Int'l, LLC*, No. 09-CV-10388 (DF), 2012 WL 6720919, at *34 (S.D.N.Y. Dec. 18, 2012)). Counsel's payment of the $400 fee for filing the summons and complaint is evident from the docket.  (*See* Dkt. Entry dated Oct. 1, 2019.)  Exhibit 4 to the Supplemental Cronen Declaration is a process server receipt for $255 evincing counsel's costs incurred serving defendants with the complaint and summons. (*See* ECF No. 25-4.)

In sum, the court grants plaintiff's counsel's request for attorneys' fees in the amount of **$12,631.25**, and reimbursement of **$655** in costs.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for entry of default judgment is GRANTED.  Plaintiff has established defendants' liability under Title VII, the NYSHRL, and the NYCHRL, for sex/gender discrimination and retaliation.  Mr. Henestroza is liable for discrimination and retaliation under the NYSHRL and NYCHRL, and defendant Brooklyn Maids is liable for discrimination and retaliation under Title VII and the NYCHRL.  Mr. Henestroza is also liable for assault and battery under New York law.

The Clerk shall enter judgment against Brooklyn Maids and Mr. Henestroza, jointly and severally, and award plaintiff the following amounts:[15]

1) **$81,180** in back pay.

---

[15]    "Although Title VII limits the amount of damages that may be awarded, the NYSHRL and NYCHRL do not."  *Houlihan's Rest.*, 2011 WL 2470023, at *4.  Thus, Title VII's damages cap does not limit the compensatory and punitive damages otherwise available under the NYSHRL and NYCHRL. Accordingly, the court awards all compensatory and punitive damages in excess of $50,000 under the NYSHRL (excess compensatory) and NYCHRL (excess compensatory and punitive).  *See Zakre v. Norddeutsche Landesbank Girozentrale*, 344 Fed. App'x 628, 631 (2d Cir. 2009) (affirming a district court's compensatory and punitive damages award of $600,000 for violations of Title VII, the NYSHRL and the NYCHRL); *see also Manzo v. Sovereign Motor Cars, Ltd.*, 491 Fed. App'x 102, 103 (2d Cir. 2011) (affirming a district court's compensatory and punitive damages award totaling $250,000 for Title VII and NYCHRL law violations); *Caravantes*, 2012 WL 3631276, at *21 ("[W]here Title VII claims are pled alongside NYSHRL and NYCHRL claims, courts have awarded damages in excess of the Title VII statutory cap by allocating the excess award to the state and city law claims.") (citation omitted).

2) Prejudgment interest on plaintiff's back pay award from March 1, 2019 through to the date judgment is entered.  The Clerk shall apply the average annual United States T-bill rate of interest for the period March 1, 2019 to September 30, as referred to in 28 U.S.C. § 1961. Interest shall be compounded annually.

3) **$98,961** in front wages.

4) **$200,000** in emotional distress damages.

5) **$375,000** in punitive damages.

6) **$12,631.25** in attorneys' fees.

7) **$665** in costs.

8) Post-judgment interest pursuant 28 U.S.C. § 1961, calculated from the date judgment is entered, and compounded annually, which shall accrue on plaintiff's awards of compensatory damages, punitive damages, and attorneys' fees and costs.

Following the entry of judgment, as set forth above,

the Clerk of Court is respectfully directed to serve a copy of

this Memorandum and Order of judgment on defendants at their

last known addresses, note service on the docket, and close this

case.

**SO ORDERED.**

Dated:     September 26, 2020
           Brooklyn, New York

                                   /s/
                         _____
                         Hon. Kiyo A. Matsumoto
                         United States District Judge